Encompass Servs., PLLC v. Maser Consulting P.A., 2021 NCBC 40.

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

ENCOMPASS SERVICES, PLLC and
ENCOMPASS SERVICES, LLC d/b/a
ENCOMPASS ENERGY SERVICES,
LLC,

                      Plaintiffs,

v.

MASER CONSULTING P.A. and
CHRISTOPHER HILSMAN,

                      Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 1782

**ORDER AND OPINION ON
CHRISTOPHER HILSMAN'S
MOTION FOR SUMMARY
JUDGMENT AND MASER
CONSULTING P.A.'S MOTION FOR
SUMMARY JUDGMENT AND
DEFENDANT HILSMAN'S MOTION
TO STRIKE**

THIS MATTER comes before the Court on Defendant Christopher Hilsman's

Motion for Summary Judgment ("Hilsman's Motion," ECF No. 109), Defendant Maser

Consulting P.A.'s ("Maser") Motion for Summary Judgment ("Maser's Motion," ECF

No. 116; collectively with Hilsman's Motion, the "Summary Judgment Motions"), and

Defendant Hilsman's Motion to Strike Plaintiff's Affidavit from J. Horne ("Hilsman's

Motion to Strike," ECF No. 166; together with the Summary Judgment Motions, the

"Motions").[1]

THE COURT, having considered the Motions, the briefs filed in support of and

in opposition to the Motions, the arguments of counsel at the hearing, and other

---

[1] In its Notice of Rescheduled Hearing (ECF No. 171), the Court also indicated it would hear argument on Encompass' Motion to Strike Expert Testimony ("Encompass' Motion to Strike," ECF No. 116); however, Encompass' Motion to Strike requests that the Court strike certain expert testimony at the trial of this matter and not in connection with the Motions. Accordingly, the Court will not address Encompass' Motion to Strike at this time.

appropriate matters of record, concludes that the Motions should be GRANTED, in part, and DENIED, in part, for the reasons set forth herein.

> *Oak City Law LLP, by Samuel Pinero for Plaintiffs Encompass Services, PLLC and Encompass Services, LLC d/b/a Encompass Energy Services, LLC.*

> *McDermott Will & Emery, LLP, by Rachel B. Cowen and Emory D. Moore Jr. for Plaintiffs Encompass Services, PLLC and Encompass Services, LLC d/b/a Encompass Energy Services, LLC.*

> *Ragsdale Liggett PLLC, by John M. Nunnally for Defendant Maser Consulting P.A.*

> *Williams Mullen, by Edward S. Schenk III and John W. Holton for Defendant Christopher Hilsman.*

McGuire, Judge.

## I.    INTRODUCTION

1.    Plaintiffs Encompass Services, PLLC and Encompass Services, LLC d/b/a/ Encompass Energy Services, LLC's (hereinafter, the two Plaintiff companies are "Encompass") and Defendant Maser Consulting P.A. ("Maser")[2] are competitors. Encompass brings this action to redress what it contends were unlawful actions taken by its former employee, Defendant Christopher Hilsman ("Hilsman"; together with Maser, the "Defendants"), leading up to and following his departure from Encompass to work for Maser.    Specifically, Encompass contends that Defendants misappropriated Encompass' legally protected information to achieve an unfair and

---

[2] Maser is a New Jersey civil survey company that began expanding its presence in North Carolina in 2017.  (ECF No. 146.5, at pp. 13–15, 73.)  Prior to 2017, Maser had no North Carolina office and no significant presence in the State.  (*Id*.)

unlawful competitive advantage—particularly as it relates to competitive bidding on projects.

2.   Instead of pursuing contract claims based on the employment agreement, Encompass relies on allegations of trade secret misappropriation under the North Carolina Trade Secrets Protection Act, N.C.G.S. § 66-152, et. seq. ("NCTSPA").  Further, Encompass contends that the same conduct it asserts as a violation of the NCTSPA is also a violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1 ("UDTPA").  Finally, Encompass contends that Hilsman and Maser committed computer trespass in violation of N.C.G.S. § 14-458 and § 1-539.2A, and tortiously interfered with Encompass' prospective contractual relations.

3.   Defendants now move for summary judgment on all claims, arguing that Encompass' trade secret claim fails as a matter of law because, even assuming Encompass' data and information at issue in this case would otherwise qualify as a trade secret, Encompass failed to take reasonable measures to guard its secrecy. Further, Defendants contend that the UDTPA claim fails because it depends on the NCTSPA claim; that the computer trespass claim fails because the statute prohibits unauthorized access to a "computer" and not a "computer network"; and that the tortious interference claim fails because (a) it is dependent on the NCTSPA, (b) Maser was justified in seeking out contracts in furtherance of its own business, and (c) Encompass has produced no "but for" evidence that it would have received any of the contracts for which it claims Defendants interfered.  Alternatively, Hilsman seeks

partial summary judgment with respect to potential damages stemming from two projects which he claims Encompass has effectively "taken off the table."

II.    FACTS[3]

4.    Many of the facts giving rise to this lawsuit are not in dispute; however, the parties' respective characterizations of the facts and their legal significance are highly contested, perhaps best illustrated by their introductions set out in their briefs.  Encompass introduces the case with the following:

> [Hilsman] formerly worked for [Encompass].  Hilsman resigned mid-August 2018 to join Encompass' direct competitor [Maser].  Before his departure, Hilsman downloaded his entire Encompass Outlook account (over 9,000 files) and approximately 1,000 additional documents to an external storage device.  These misappropriated documents included extensive confidential bidding, pricing, and project information that provided Hilsman and Maser a roadmap to Encompass' proposed pricing and staffing proposals surveying projects in North Carolina, where the two companies were regularly competing head-to-head in confidential bidding processes.

(ECF No. 163, at p. 1.)  In contrast, Hilsman and Maser introduce the case with the following:

> This is not a case . . . of a departing employee who, cloaking his plans, surreptitiously and maliciously downloaded company secrets and stole away in the dark of night to work for a competitor.  No, Hilsman transparently resigned his employment to work for a competitor (Maser), worked out his notice, helped prepare his successor, and walked

---

[3] The Court does not make findings of fact on a motion for summary judgment, but rather summarizes the material facts it considers to be undisputed.  The facts as included herein are drawn from the allegations in the Verified Complaint that are not in dispute (ECF No. 3; *see* Answer of Defendant Christopher Hilsman, ECF No. 40; Defendant Maser Consulting P.A.'s First Amended Answer to Plaintiffs' Complaint and Counterclaim Against Plaintiffs, ECF No. 61), as well as the evidentiary record on summary judgment.

out the door. When he did, he had Encompass' electronically stored information innocently in his possession – information which he had accumulated over years of employment with the company.

(ECF No. 126 [SEALED], redacted at ECF No. 137, at p. 1.)

Encompass filed this lawsuit after it realized that it made a mistake when it off-boarded one of its former employees but before it conducted any meaningful investigation into whether that employee or his new employer unfairly exploited that mistake to gain an unfair and competitive advantage. Instead, as the testimony and evidence collected during discovery reveals, Encompass not only failed to secure any of the data or information that it claims is confidential and/or a trade secret, but it also failed to follow many of its own procedures for departing employees. Encompass seeks to hold Defendants responsible for its own mistakes and to gain an advantage over its competitor, which this Court should not permit.

(ECF No. 125, at p. 1.)

A.    **Encompass**

5.    Encompass is a national civil survey firm specializing in providing land surveying services for oil and gas transmission pipelines, including "conducting pipeline surveys, mapping, routing, and pipeline integrity testing[.]" (ECF No. 3, at ¶ 8; Oware Dep., ECF No. 114.2, at p. 48.)[4] Encompass expanded its operations into North Carolina in 2011. (Aff. of Jeremiah Horne, ECF No. 146.14 (hereinafter, the "Horne Affidavit").)

---

[4] Encompass Services, LLC is a Texas company with its principal place of business in Texas. (*Id*. at ¶ 2.) Its subsidiary, Encompass Services, PLLC is a North Carolina company with its principal place of business in Asheville, North Carolina. (*Id*. at ¶1.)

6.     Encompass typically obtains work through confidential, competitive bids made directly to an energy provider or through an engineering prime contractor/engineering service provider.  (Horne Dep. ECF No. 146.2 [SEALED], redacted at ECF No. 146.15, at pp. 245–46; ECF No. 3, at ¶ 11; ECF No. 40, at ¶ 11.) To accurately estimate costs and prepare the most competitive bid proposal, Encompass relies on data that it has gathered including: "(i) cost data for prior similar projects, (ii) maps and drawings developed with the use of expensive investments in technology such as radar scanning, and satellite and aerial imaging, (iii) knowledge of constructability, environmental, and socio-economic issues, . . . ."  (ECF No. 3, at ¶ 12; ECF No. 40, at ¶ 12.)

7.     Since 2011, Encompass has compiled a library of what it considers "confidential and proprietary" documents to "assist with its bidding and project execution process" in the North Carolina market.  (ECF No. 146.14, at ¶ 4.)  These documents include "rate and fee tables, negotiated subcontractor services agreements[,] and past proposals/bids" as well as "Encompass' as-built data regarding specific lines, change orders, budget trackers, survey and point base documents[,] and mosaics."[5]  (*Id*. at ¶¶ 4–5.)  Further, Encompass' document library contains non-public plat documents, field notes, requests for proposals, requests for information, emails, and other business information it uses to assist with its operations.  (*Id*. at ¶

---

[5] "As-built" data refers to a file containing all the aggregated information pertaining to a particular project, including "every single point of data that was collected by every single crew for the entire duration" of a project.  (ECF No. 146.2 [SEALED], redacted at ECF No. 146.15, at pp. 35–36.)

6.) Encompass "considers this data confidential and prohibits its disclosure to third parties" (ECF No. 3, at ¶ 13), and "would consider most of these documents a trade secret" (ECF No. 146.14, at ¶¶ 4–5).[6]

### i. Server storage of Encompass data

8.　　Encompass stores its "confidential and proprietary" documents on a cloud-based server operated by a third-party application, Egnyte ("the "Egnyte" server). (ECF No. 3, at Ex. A, ¶ 5.)[7] Encompass hired Technology Solution Partners, Inc. d/b/a CMIT Solutions of Pittsburgh North ("CMIT") to set up and manage the Egnyte server. (ECF No. 146.14, at ¶ 8.) Access to the Egnyte server requires a valid username and password, which is issued by CMIT at the direction of Encompass. (ECF No. 3, at Ex. A, ¶ 5.) All Encompass employees are provided with an Egnyte username and password. (Cooper Dep., ECF No. 114.10, at p. 105.)

9.　　Egnyte restricts each particular employees' access by both Folder Permissions (*i.e.*, the set of actions a user can perform on a particular folder, such as whether a user can download files) and User Types (*i.e.*, a classification system that determines the number/set of documents to which a particular employee has access).

---

[6] For example, Senior Vice President and co-founder of Encompass, Jeremiah Horne ("Horne"), provided in his affidavit that "most of these documents have independent commercial value" in that they would allow a competitor "to win a bidding contest against Encompass" and that Encompass' as-built data in the hands of a competitor would save the competitor potentially "tens of thousands or hundreds of thousands of dollars." (ECF No. 146.14, at ¶ 4; ECF No. 146.2 [SEALED], redacted at ECF No. 146.15, at p. 37.)

[7] Encompass used the cloud-based storage platform "Dropbox" to store company data prior to migrating to Egnyte in 2016. (ECF No. 110.1, at p. 111.)

(ECF No. 146.14, at ¶ 9.) Further, when Encompass' data is transferred to or from the Egnyte server, the data is encrypted. (ECF No. 146.14, at ¶ 6.)

10. Egnyte allows for the use of various features and applications, including an Egnyte Desktop Sync function, allowing users to automatically download files and/or entire folders from the Egnyte server to a hard drive (Hilsman Aff. in Opp. to Mot. For TRO, ECF No. 28, at ¶ 20; Egnyte Instructions, ECF No. 114.8); an auto-login feature, allowing for log-in credentials to be saved (Yalamarthy Dep., ECF No. 146.4, at pp. 71–76)[8]; and a phone app allowing for use of Egnyte on a cell phone (ECF No. 114.4 [SEALED], redacted at ECF No. 134.5).

11. With respect to storage of Encompass employee email, Encompass uses Microsoft Outlook, and maintains the emails on a Microsoft Outlook Exchange Server. (ECF No. 146.4, at pp. 80–81; Hilsman Dep., ECF No. 146.6, at pp. 163–64.) Encompass employees have access to their email when connected to Encompass' system via a virtual private network ("VPN"). (*Id.*) Thus, Encompass employees may access their emails upon entering their username and password on a company-issued computer or via web access through use of a multi-factor identification process (*e.g.*, by cell phone). (*Id.*)

*ii. Local computer storage and external storage devices*

---

[8] Chief Technology Officer for CMIT, Sunil Yalamarthy ("Yalamarthy"), testified at his deposition that the Egnyte system has an auto-login feature where you can save a password, which Egnyte then forces you to re-enter "every now and then," but Yalamarthy could not "remember exactly how many weeks or how many days it is[.]" (ECF No. 146.4, at pp. 71–76.)

12.     Some, but not all, Encompass employees are provided company-issued computers. (Oware Dep., ECF No. 114.2, at pp. 105–06.) Further, no Encompass employees were provided company-issued cell phones or other external storage devices (*e.g.*, USB thumb drives). (*Id.*; 3/10/16 email from Horne, ECF No. 114.4 [SEALED], redacted at ECF No. 134.5.) Thus, while Encompass used the Egnyte and Outlook servers as centralized storage locations for its data and information, Encompass employees inevitably downloaded and stored this data onto either (a) hard drives on their company-issued computers or (b) personally owned storage devices (*e.g.,* personal computer hard drives, cell phones, USB thumb drives). (ECF No. 114.2, at pp. 105–10; ECF No. 114.4 [SEALED], redacted at ECF No. 134.5; 114.10, at p. 16.) For example, Tyler Hastings ("Hastings"), Hilsman's former supervisor at Encompass, testified at his deposition that he used personal electronic storage devices when in the field to store and access Encompass data and information, and that he knew other employees also did so. (Hastings Dep., ECF No. 110.9, at pp. 34–36.) Further, former Encompass employee Philip Shaw ("Shaw") testified that "every surveyor has company information on a flash drive somewhere, every single one." (Shaw Dep., ECF No. 110.4, at p. 65.)

13.     Encompass' company-issued computers require a username and password, but this security function can be disabled, and Encompass had no policy prohibiting employees from disabling this security function. (ECF No. 114.2, at p. 135; ECF No. 28, at ¶ 22.) Upon an employee's departure or termination of

employment with Encompass, employees are required to return their company-issued laptops. (Offboarding Checklist, ECF No. 110.10.)

14. With respect to its employees' use of personal storage devices, Encompass had no formal policies. (Horne Dep., ECF No. 110.2, at p. 190.) Encompass was aware of but did not limit its employees' use of personal devices to store Encompass data. (Cooper Dep., ECF No. 114.10, at p. 18; ECF No. 114.2, at pp. 105–07, 116.) Encompass did not require employees to password protect their personal external devices, nor did it catalogue which employees use them. (3/4/19 Hilsman Aff., ECF No. 110.5, at pp. 123–126.) Moreover, Encompass did not track or monitor any of its employees' use and storage of Encompass documents and information (Encompass Rule 30(b)(6) Dep., ECF No. 114.3, at p. 191; Hastings Dep., ECF No. 114.1, at pp. 46–48), and did not ask departing employees to secure, return, or destroy company data on these devices (ECF No. 110.9, at pp. 48–49; *see e.g.*, ECF No. 110.3, at p. 13–16).

### iii. *Confidentiality policies*

15. Aside from the protection provided by its use of the Egnyte server, Encompass required its employees to execute Employment Agreements containing confidentiality provisions. (ECF No. 110.9, at p. 34; *see e.g.*, Hilsman Employment Contract, ECF No. 110.11.) Further, in 2016, Encompass implemented certain "Standards of Conduct" disseminated in an employee handbook. Included in the Standards of Conduct was a policy titled "Confidentiality/Intellectual Property" that stated, in pertinent part:

[y]our employment with [Encompass] assumes an obligation to maintain confidentiality even after you leave our employment. Employee agrees that all information . . . shall be held in confidence by Employee and shall not be used by Employee for any purpose other than for the performance of the services contemplated by this Agreement or any other agreement between the parties. . . . Employee agrees that it shall not make disclosure of any such Confidential Information to anyone except to whom disclosure is necessary for the purposes of accomplishing the work to be performed by Employee. . . . Because of its seriousness, disclosure of confidential information could lead to disciplinary action up to, and including, termination.

(Encompass Standards of Conduct, ECF No. 146.1, at p. 2 (hereinafter, the "Standards of Conduct").)

16.     Nevertheless, the record is less than clear as to whether employees understood the details of Encompass' confidentiality policies as it applied to the Egnyte server, and to what, if any, extent these policies were enforced. (ECF No. 110.3, at p. 40; ECF No. 110.6, at pp. 48–49, 181; ECF No. 110.9, at p. 34.) For example, Encompass did not mark any of its confidential documents on the Egnyte server with a confidentiality sticker or tag. (ECF No. 114.1, at p. 33.)

B.      **Hilsman's Employment with Encompass**

17.     Hilsman worked for Encompass as a Field Surveyor from April 2012 to January 2014, and later as a Survey Supervisor from April 2015 until August 2018. (ECF No. 3, at ¶¶ 15–18; ECF No. 40, at ¶¶ 15–18; ECF No. 146.14, at ¶ 12; ECF No. 3, at Ex. B.) In his role, Hilsman was directly involved in the process of preparing bid proposals within his region. (ECF No. 3, at ¶ 16; Hilsman Answer, ECF No. 40, at ¶ 16.) As Survey Supervisor, Hilsman had access to a small portion of the data on

the Egnyte server and would utilize Encompass' data stored on that server to help the Southeast Regional Director prepare bid proposals. (*Id.*; ECF No. 146.14, at ¶ 12; ECF No. 152.2, at p. 31.)[9]

18. As a condition to his second stint of employment with Encompass beginning in April 2015, Hilsman entered into an Employment Agreement. (ECF No. 3, at ¶ 15; "Employment Agreement," ECF No. 3 at Ex. B.) The Employment Agreement stated, in pertinent part,

> EMPLOYEE . . . agrees that they shall not, at any time during the term of this Agreement or for one year thereafter, disclose to or make use of for any person, corporation or other entity, any proprietary files, trade secrets or other confidential information defined as, the business, clients, methods, operations, financing or services of [Encompass]. EMPLOYEE acknowledges that all files, lists, books, records, literature, products and any other materials owned by [Encompass] shall at all times remain the property of [Encompass].

(ECF No. 3, at ¶ 17; ECF No. 3 at Ex. B, ¶ 8.) Notably, however, while Hilsman signed the Employment Agreement, Encompass neither signed the agreement nor entered an acceptance date. (*Id.*) Further, Hilsman claims he did not fully understand the content of his Employment Agreement. (ECF No. 110.6, at p. 181.) In 2016, Hilsman was also provided with a copy of and/or access to an employee handbook containing the Standards of Conduct. (ECF No. 114.2, at p. 79.)

19. While working at Encompass, Hilsman used a company-issued computer, which Hilsman claims was not password-protected. (ECF No. 110.5, at ¶

---

[9] To provide context, Encompass has close to 5 million files in Egnyte, and Hilsman had access to roughly 60,000 of them. (ECF No. 146.14, at ¶ 12.)

11.) Hilsman used the auto-login feature on Egnyte, allowing him to save his login credentials such that he was not required to manually put in his username or password to access the Egnyte server. (*Id.* at ¶ 19; ECF No. 146.4, at pp. 71–76.) Hilsman states that "by simply powering on [his] laptop," and in conjunction with Egnyte's Desktop Sync function, Egnyte would "automatically 'download' and update the working files containing Encompass project information" and "anyone who powered on the laptop would have full and unencumbered access to all company information stored on the laptop." (Hilsman Aff., ECF No. 110.5, at ¶¶ 21–22.)

20. In addition to the use of his company-issued computer, Hilsman also utilized a personal non-password-protected external storage device and a personal cell phone to access and/or store Encompass data and information. (*Id.* at ¶¶ 7–9, 27.) Hilsman's external storage device contained "massive amounts of company data and project files." (*Id.* at ¶ 17.) Hilsman admits that he maintained files long after projects were completed because he would frequently get follow-up questions from clients—potentially years later—about an old project. (Hilsman Dep., ECF No. 110.6, at p. 66.)

C. **Hilsman's Departure for Maser**

21. In June 2018, Hilsman was approached by Tommy Mallard ("Mallard"), Maser's Regional Director of the Survey Geospatial Division, who had been tasked with growing Maser's presence in North Carolina. (Mallard Dep., ECF No. 146.5, at pp. 13, 20–21.) In July 2018, Mallard offered Hilsman the position of Senior Survey Project Manager, in which Hilsman would be responsible for business development,

including preparing bids and managing customer relationships. (*Id*. at pp. 18–19, 22–24.)

22. On August 3, 2018, Hilsman notified Encompass that he was resigning his employment to join Maser and provided two weeks' notice. (ECF No. 146.6, at pp. 163–64.) On the same day, Hilsman's entire Encompass email account was backed up to an external storage device, although Hilsman maintains that this was a regularly scheduled automatic backup. (ECF No. 146.6, at pp. 163–64.)

### i. Off-boarding from Encompass

23. Encompass claims that its off-boarding procedure consists of "a comprehensive off-boarding checklist followed to ensure data security and to protect confidential information and trade secrets, [which] includes collecting company-issued equipment (e.g. laptops) and notifying Encompass' third-party vendor to shut down access upon termination to its cloud-based server." (Encompass Disc. Resp., ECF No. 110.15 [SEALED], redacted at ECF No. 134.2, at .pdf p. 22, ¶ 9.)[10] The off-boarding checklist assigns each action item to an Encompass employee, and provides that each item is "[d]ue on termination date." (*Id*.)

24. On the date it received Hilsman's two weeks' notice, Encompass notified CMIT of Hilsman's resignation and requested that Hilsman's access to the Egnyte server be revoked effective August 17, 2018. (ECF No. 146.14. at ¶ 13.) Within

---

[10] The off-boarding checklist produced by Encompass contains the following action items: (i) deactivate AutoCad License, (ii) inactivate ISN, (iii) deactivate email account, (iv) send employee evaluation, (v) equipment reconciliation, and (vi) inactivate on employee bio sheet. (Hilsman's Off-boarding Checklist, ECF No. 110.10.)

minutes, CMIT responded confirming the revocation. (ECF No. 114.3, at p. 205.) However, CMIT inadvertently failed to revoke Hilsman's access, which remained active until January 2019, approximately four months following Hilsman's departure. (ECF No. 3, at Ex. A, ¶ 8; ECF No. 146.4, at p. 47; ECF No. 114.2, at p. 84.)

25.     Hilsman's last day of employment with Encompass was August 17, 2018. Despite its policy requiring that it do so, Encompass did not conduct a formal exit interview or provide an evaluation to Hilsman. (ECF No. 114.3, at p. 169.) Encompass also failed to collect Hilsman's company-issued laptop upon his departure. Rather, Hilsman's supervisor, Hastings, told Hilsman to leave his laptop at one of Encompass' job trailers. (Hastings Dep., ECF No. 114.1, at p. 51.) Another Encompass employee, Shaw, used Hilsman's computer until August 31, 2018. (ECF No. 114.11, at pp. 35–36; ECF No. 114.3, at pp. 205–06.) During this period, documents were uploaded to and downloaded from the Egnyte server via Hilsman's Egnyte account both by Shaw and through operation of the desktop sync application. (*Id.*; ECF No. 114.9, at p. 54.)

### ii.   Hilsman joins Maser

26.     It is undisputed that after joining Maser on August 20, 2018, Hilsman accessed and downloaded Encompass data and information from the Egnyte server, some of which was subsequently located on Maser's server. (ECF No. 146.6, at pp. 124, 138–39, 143; Hash Hits Spreadsheet, ECF No. 120.11.)

27.     In addition, when Hilsman departed Encompass, certain responsibilities regarding the "Line 434" project fell to the next employee in the chain of command,

Shaw. (ECF No. 114.9, at pp. 81–82.) Seeking assistance with the project from Hilsman, Shaw downloaded the Line 434 project folder to an external storage device and brought it to Hilsman's house, where the Line 434 project documents were subsequently downloaded onto Hilsman's Maser-issued laptop. (Shaw Dep., ECF No. 114.11, at p. 41; ECF No. 146.7, at p. 14; Hilsman Dep., ECF No. 146.6, at pp. 76, 83–84, 94; Hastings Dep., ECF No. 114.1, at pp. 20–23.)[11]

28. CMIT also discovered via routine audit that on more than sixty (60) occasions after Hilsman's employment with Encompass terminated, Hilsman's credentials were used to access, view, or download information from the Egnyte server by way of the mobile phone application. (Oware Dep., ECF No. 146.3, at p. 120; Yalamarthy Dep., ECF No. 146.4, at pp. 76–77; Egnyte Data, ECF No. 152.5.)

29. Encompass contends that Hilsman used its "confidential" information to give Maser an advantage in head-to-head bidding with Encompass for potential work, particularly with respect to the Duke Energy and Piedmont Natural Gas Line 328 Project (hereinafter, the "Line 328" project). (ECF No. 163, at p. 11.) First, on August 22, 2018, Hilsman submitted a worksheet to his supervisor at Maser containing preliminary labor and pricing assumptions for Maser's bid. Hilsman prepared the worksheet using a template from a recent Encompass proposal which included Encompass' recent labor and pricing assumptions. (ECF No. 146.9 [SEALED]; ECF No. 152.2, at pp. 110–12.) Second, Maser's initial August 22, 2018 bid for the Line 328 project was higher than Encompass' August 28, 2018 bid, but on September 20,

---

[11] Shortly thereafter, Shaw also resigned from Encompass and joined Hilsman at Maser. (ECF No. 152.2, at p. 70.)

2018, Maser submitted a revised lower bid—the same day that Hilsman accessed Encompass' August 28, 2018 proposal on the Egnyte server. (ECF No. 146.10 [SEALED]; ECF No. 120.8; ECF No. 146.6, at p. 138.) Maser ultimately won the project.

30. Encompass alleges that "Hilsman continued to access and use Encompass proposals . . . as he priced other Maser projects" and that "[s]ome of these [projects] were also awarded to Maser." (ECF No. 163, at p. 12.) For these reasons, Encompass believes it is entitled to lost profits on the following projects: the Line 328 Project, the Line 456/457 Project; the Line 466 Project; the Line 467 Project; and the Rutland Road project. (ECF No. 110.15 [SEALED], redacted at ECF No. 134.2, at .pdf p. 33.)

III.   PROCEDURAL HISTORY

31. Encompass initiated this action by filing a Verified Complaint on January 30, 2019. (ECF No. 3.) This matter was designated as a complex business case and assigned to the undersigned on January 31, 2019. (Des. Ord., ECF No. 1; Assign. Ord., ECF No. 2.)

32. In the Verified Complaint, Encompass brought a claim against Hilsman for conversion ("First Claim"), and claims against both Hilsman and Maser for: misappropriation of trade secrets in violation of the NCTSPA ("Second Claim"); tortious interference with prospective economic advantage ("Third Claim"); computer trespass ("Fourth Claim"); unfair trade practices in violation of UDTPA ("Fifth Claim"); and punitive damages ("Sixth Claim"). (ECF No. 3, ¶¶ 41–68.)

33. Hilsman and Maser filed motions to dismiss the Verified Complaint. ("Hilsman's MTD," ECF No. 38; "Maser's MTD," ECF No. 63.) On November 5, 2019, the Court issued its Order and Opinion on the motions to dismiss. (ECF No. 84.) The Court dismissed Encompass' claim for conversion against Hilsman, but otherwise, denied Hilsman's MTD and denied Maser's MTD.

34. On December 16, 2020, both Hilsman and Maser filed their respective Motions for Summary Judgment on Encompass' remaining claims. Along with the Motions for Summary Judgment, Hilsman and Maser subsequently filed their respective briefs in support (Def. Christopher Hilsman's Memo. ISO his Mot. for Summ. J., ECF No. 126 [SEALED], redacted at ECF No. 137; Def. Maser Consulting P.A.'s Bf. ISO its Mot. for Summ. J., ECF No. 125). Hilsman also filed evidentiary exhibits in support of Hilsman's Motion (ECF No. 110.1–110.16), and Maser filed evidentiary exhibits in support of Maser's Motion (ECF No. 114.1–114.12).

35. Encompass filed a consolidated Brief in Opposition to Defendants' Motions for Summary Judgment ("Brief in Opposition," ECF No. 163) and supporting exhibits (ECF No. 146.1–146.15).

36. Hilsman and Maser filed reply briefs in support of their respective Motions for Summary Judgment. (Hilsman's Reply, ECF No. 164; Maser's Reply, ECF No. 165.)

37. On February 22, 2021, Hilsman's Motion to Strike was filed with the Court. (ECF No. 166.) Encompass filed a brief in opposition to Hilsman's Motion to

Strike.  (Encompass' Bf. in Opp. to Hilsman's Motion to Strike, ECF No. 176.)  No reply brief was filed.

38.    The Court held a hearing on the Motions on March 19, 2021 at which counsel appeared and made arguments.  The Motions are now ripe for decision.

IV.    STANDARD OF REVIEW

39.    Summary judgement is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs.*, 365 N.C. 520, 523 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c)).  "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense."  *CSX Transp., Inc. v. City of Fayetteville*, 247 N.C. App. 517, 521 (2016) (quoting *Lowe v. Bradford*, 305 N.C. 366, 369 (1982)).

40.    On a motion for summary judgment, the Court views the evidence in the "light most favorable to the non-moving party."  *Allstate Ins. Co. v. Lahoud*, 167 N.C. App. 205, 207 (2004) (citation omitted).  "The party moving for summary judgment ultimately has the burden of establishing the lack of any issue of triable fact."  *Unitrin Auto & Home Ins. Co. v. McNeill*, 215 N.C. App. 465, 467 (2011) (citations omitted).  The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense."  *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted).

Once the moving party "makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial." *Unitrin Auto & Home Ins. Co.*, 215 N.C. App. at 467 (citations omitted).

V.   ANALYSIS

A.   **Trade Secrets Protection Act**

   *i. Motion to Strike*

41.   Preliminarily, the Court will address Hilsman's Motion to Strike. (ECF No. 166.) Hilsman contends that the Horne Affidavit (ECF No. 146.14) was prepared after the close of discovery "[i]n an attempt to manufacture a triable issue of fact (where one does not exist) on the singular issue of [Encompass'] lack of 'reasonable security measures' used to protect their purported trade secrets" and is a sham affidavit that contradicts [Horne's] earlier sworn testimony as a Rule 30(b)(6) designee." (ECF No. 166, at pp. 1–2.)

42.   The Court disagrees. At best, the alleged inconsistencies between Horne's affidavit and his deposition testimony go to Horne's credibility. Hilsman has not pointed to any direct contradictions that render the affidavit a sham. Therefore, having considered Hilsman's Motion to Strike, the briefs in support and in opposition, and the arguments of counsel at the hearing, the Court concludes, in its discretion, that Hilsman's Motion to Strike should be DENIED. *See W&W Partners, Inc. v. Ferrell Land Co., LLC*, 2019 NCBC LEXIS 104, at *3 (N.C. Super. Ct. Dec. 6, 2019) ("The introduction of evidence into the record, including the Court's decision on a

motion to strike an affidavit, is left to the sound discretion of the trial court." (citing *3 Waterway Drive Prop. Owners' Ass'n, Inc. v. Town of Cedar Point*, 224 N.C. App. 544, 555 (2012))).

### ii. Reasonable efforts to maintain secrecy

43. Defendants argue that none of the Encompass documents or information allegedly misappropriated by Hilsman and Maser qualify as a "trade secret" under the NCTSPA because Encompass failed to use reasonable efforts to maintain their secrecy. (ECF No. 126 [SEALED], redacted at ECF No. 137, at pp. 12–18; ECF No. 125, at pp. 12–19.)[12] Specifically, Defendants point to: (a) Encompass' lack of any policy regarding the use of non-password protected personal storage devices to store files downloaded from the Egnyte server; (b) Encompass' "threadbare" Employment Agreement, which was not signed or dated by Encompass, and which Hilsman claims he did not fully understand; (c) and Encompass' off-boarding failures, including Encompass' failure to revoke Hilsman's access to the Egnyte server after his departure from Encompass. (ECF No. 125, at pp. 18–19; ECF No. 126 [SEALED], redacted at ECF No. 137, at pp. 13–19.)

44. In response, Encompass argues that its measures to maintain the secrecy of its documents or information at issue are sufficient to create an issue of

[12] For the purposes of their arguments on summary judgment, Defendants assume Encompass can establish all other elements of a legally protected trade secret as to at least some of the documents and information at issue. (ECF No. 126 [SEALED], redacted at ECF No. 137, at p. 12, n.4; ECF No. 125, at p. 14.) Thus, Defendants solely focus their argument on the reasonableness of Encompass' efforts to protect the secrecy of its purported trade secrets, without conceding the other elements are established.

material fact for the jury, therefore precluding summary judgment on this issue. (ECF No. 163, at pp. 15–17.) Specifically, Encompass contends that:

> [Encompass] required employees to execute confidentiality agreements. Employees were required to use unique login credentials to log into their [c]ompany-issued computers. Only select employees were provided web access to work product or Outlook and such access required further login credentials or security measures. Even employees with enhanced access still were limited to accessing only those documents for which they had a need to know. Numerous courts have recognized that such measures are sufficient to bring a claim for trade secret misappropriation.

(ECF No. 163, at p. 15.)

45. The NCTSPA provides the owner of a trade secret with a "remedy by civil action for misappropriation of his trade secret." N.C.G.S. § 66-153 (2021). A "trade secret" is defined as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. *Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.*

N.C.G.S. § 66-152(3) (2021) (emphasis added).

46. In assessing whether information that would otherwise qualify as a purported trade secret "is the subject of efforts that are reasonable . . . to maintain its secrecy," our courts have recognized that the "inquiry is fact-specific, and 'courts

that have addressed it closely examine the circumstances surrounding the trade secret to determine what measures are reasonable.'" *Comput. Design & Integration, LLC v. Brown*, 2018 NCBC LEXIS 216, at *46 (N.C. Super. Ct. Dec. 10, 2018) (quoting *Koch Measurement Devices Inc. v. Armke*, 2015 NCBC LEXIS 45, at *15 (N.C. Super. Ct. May 1, 2015)). "The critical question in deciding this issue on summary judgment is 'whether [plaintiffs are] entitled to ask the jury to undertake an analysis of the reasonableness of [plaintiffs'] efforts to maintain the confidentiality of the information.'" *Id.* at *48–49 (citation omitted).

47. As cited by the parties in their briefs, this Court has, on numerous occasions, addressed on summary judgment a defendant's argument that plaintiffs failed to make reasonable efforts to maintain the secrecy of its information. *See, e.g.*, *Hopkins v. MWR Mgmt. Co.*, 2017 NCBC LEXIS 47, at *73 (N.C. Super. Ct. May 31, 2017) (holding plaintiff's efforts sufficient to create jury issue and denying summary judgment where confidential documents were stored on a community computer with generic login information written down on a sticky note attached to the screen, access was restricted to only certain employees, and employees executed employment agreements detailing the handling of confidential data); *TaiDoc Tech. Corp. v. OK Biotech Co.*, 2016 NCBC LEXIS 26, at *21–25 (N.C. Super. Ct. Mar. 28, 2016) (denying summary judgment where there were multiple measures to protect the confidentiality of the information, including confidentiality acknowledgements on every page, confidentiality labels on disclosed documents, a draft confidentiality agreement to be executed, and restricted access to full disclosure); *Koch Measurement*

*Devices, Inc,* 2015 NCBC LEXIS 45, at *16 (denying summary judgment where plaintiff kept its confidential material in locked facilities and included a nondisclosure provision in its employment agreements); *Safety Test & Equip. Co., Inc. v. Am. Safety Util. Corp.*, 2015 NCBC LEXIS 40, at *32–33 (N.C. Super. Ct. Apr. 23, 2015) (denying summary judgment where plaintiff kept its confidential material in locked facilities under video surveillance, maintained a password-protected database, included confidentiality agreements with some suppliers, and included a nondisclosure provision in its employment agreements); *Edgewater Servs. v. Epic Logistics, Inc.*, 2009 NCBC LEXIS 21, at *11–15 (N.C. Super. Ct. Aug. 11, 2009), *aff'd*, 217 N.C. App. 399 (2011) (holding plaintiff's efforts not reasonable as a matter of law and granting summary judgment for defendant where plaintiff maintained confidential files in an "unlocked file room, accessible to anyone" without safeguards to ensure security).

48.    Notably, the only case cited by Defendants in which this Court granted summary judgment on the grounds that the plaintiff failed to take reasonable measures to protect the secrecy of a trade secret is *Edgewater*.  In their briefs, both Defendants attempt to analogize the facts of this case to those in *Edgewater*.  (ECF No. 125, at pp. 17–19; ECF No. 126 [SEALED], redacted at ECF No. 137, at pp. 13–14.)  However, the Court is not persuaded that Encompass' password protected Egnyte server, coupled with confidentiality provisions in employment agreements, is tantamount to an "unlocked file room, accessible to anyone." *Edgewater*, 2009 NCBC LEXIS 21, at *12.

49.     As persuasive authority, Defendants also point to a recent case out of the Eastern District of North Carolina, *Neighborhood Networks Publ'g, Inc. v. Lyles*, No. 7:19-CV-89-BO, 2021 U.S. Dist. LEXIS 18445 (E.D.N.C. Feb. 1, 2021), which Defendants contend presents a "remarkably similar fact pattern" that "appears to be the first instance where a court has evaluated a situation where an employer failed to remove a former employee's electronic database access in the context of a trade secret misappropriation claim under North Carolina law." (ECF No. 164, at p. 2; ECF No. 165, at p. 4.)

50.     In *Neighborhood Networks Publ'g*, the federal district court granted summary judgment for defendant, finding that plaintiff's information at issue was not subject to "reasonable efforts to maintain its secrecy" and therefore not entitled to trade secret protection. 2021 U.S. Dist. LEXIS 18445, at *16–17. The court noted that the plaintiff magazine publisher continued to allow defendant, a former franchisee, access to plaintiff's cloud-based server for seven months after the defendant sold her franchise, and "could have terminated her access at any time[.]" *Id*. Here, however, it is not in dispute that Encompass timely requested CMIT to revoke Hilsman's access to the Egnyte server upon his departure from Encompass. Unlike in *Neighborhood Networks Publ'g*, Encompass *did* take action to terminate Hilsman's access to the cloud-based server. The only reason Hilsman retained access to the cloud-based server was because of the inadvertent failure of a third-party IT firm, and CMIT discovered and corrected its failure four months after Hilsman's

departure from Encompass. Thus, this Court concludes that *Neighborhood Networks Publ'g* is distinguishable from this case.

51. The facts demonstrate that Encompass made at least some efforts to maintain the secrecy of its information, including maintaining a password-protected database with levels of access granted on a need-to-know basis; password protected company-issued computers; written employment agreements with confidentiality provisions; and an employee handbook including Standards of Conduct on the confidentiality of intellectual property.

52. Defendants seek to rebut these facts, noting that there is evidence that Encompass' employment agreements and employee handbook lack specificity as to information on the Egnyte server; passwords to the Egnyte server can be saved; the passwords on company-issued computers can be disabled; there were no policies with respect to the use of personal external storage devices to store data downloaded from the Egnyte server; and Encompass failed to properly off-board departing employees, including Hilsman, to ensure the secrecy of its purported trade secrets.

53. Although Defendants have cast doubt on the adequacy of Plaintiffs' efforts to maintain the secrecy of their purported trade secrets, viewing the evidence in the light most favorable to Encompass, the Court finds that Encompass has provided sufficient evidence of measures to protect its confidential information to create an issue of fact as to their reasonableness, and the Court cannot conclude as a matter of law that Encompass has failed to adequately protect this information. *See, e.g., Roundpoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *36–38 (N.C. Super.

Ct. Feb. 18, 2016) (holding confidentiality provision in handbook, password-protected computer systems, and employee confidentiality agreements created issue of material fact as to whether plaintiff took reasonable measures even where defendants "produced evidence that could lead a jury to doubt the adequacy of [plaintiff's] policies"). While a jury may be particularly troubled by Encompass' failures to implement or enforce many of its confidentiality policies, especially with respect to the use of personal external storage devices, the Court concludes that Encompass' claim for Defendants' violation of the NCTSPA should survive summary judgment. Accordingly, to the extent Hilsman's Motion and Maser's Motion seek summary judgment in their favor as to Encompass' NCTSPA claim, Defendants' Motions for Summary Judgment should be DENIED.

## B. Tortious Interference with Prospective Economic Advantage

### i. Maser's Motion

54. In Maser's Motion, Maser's sole argument in favor of summary judgment on the claim for tortious interference with prospective advantage is that "Encompass' claims of Tortious Interference with Prospective Economic Advantage . . . fail along with its claim for misappropriation of trade secrets." (ECF No. 125, at p. 19.) Specifically, Maser solely argues that "Encompass bases its claim for tortious interference . . . on its allegations that Maser stole and misappropriated its protected trade secrets" which "Encompass cannot establish[.]" (*Id*. at p. 20.) Since the Court has concluded that Encompass' misappropriation claim under the NCTSPA should survive summary judgment, Maser's Motion seeking summary

judgment in its favor on Encompass' tortious interference claim should, accordingly, be DENIED.

### ii. Hilsman's Motion

55. Hilsman argues that Encompass has failed to establish a claim for tortious interference with prospective economic advantage because (1) "Encompass and Maser were responding to Requests for Proposals ("RFPs") from third-party engineering firms involving multiple bidders" and "Maser was justified in seeking out contracts in furtherance of its own business"; and (2) "Encompass has produced no 'but for' evidence that it would have received any of the contracts for which it claims Defendants interfered." (ECF No. 126 [SEALED], redacted at ECF No. 137, at pp. 19–21.)

56. "An action for tortious interference with prospective economic advantage is based on conduct by the defendants which prevents the plaintiffs from entering into a contract with a third party." *Walker v. Sloan*, 137 N.C. App. 387, 392–93 (2000) (citing *Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 680 (1992)). A claim for tortious interference with prospective economic advantage requires a plaintiff to show that the defendant "interfere[d] with a business relationship 'by maliciously inducing a person not to enter into a contract with [the plaintiff], which he [or she] would have entered into but for the interference, . . . if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights.'" *Beverage Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 368 N.C. 693, 701 (2016) (quoting *Spartan Equip. Co. v. Air Placement Equip. Co.*, 263 N.C.

549, 559 (1965)). The malice required to overcome a justification of business competition is legal malice, and not actual malice. *Childress v. Abeles*, 240 N.C. 667, 675 (1954) ("It is not necessary, however, to allege and prove actual malice in the sense of personal hatred, ill will, or spite in order to make out a case for the recovery of compensatory damages against the outsider for tortiously inducing the breach of the third person's contract with the plaintiff. The term 'malice' is used in this connection in its legal sense and denotes the intentional doing of the harmful act without legal justification."). Legal malice "means intentionally doing a wrongful act or exceeding one's legal right or authority in order to prevent the making of a contract between two parties" and the act "must be taken with the design of injuring one of the parties to the contract or of gaining some advantage at the expense of a party." *Bldg. Ctr., Inc. v. Carter Lumber of the North, Inc.*, 2017 NCBC LEXIS 85, *28-29, (N.C. Super. Ct. Sept. 21, 2017) (quoting *Murphy v. McIntyre*, 69 N.C. App. 323, 328-29 (1984)).

57. Encompass responds only to Hilsman's second argument that Encompass cannot produce "but for" evidence that Encompass would have awarded any of the contracts with which it claims Defendants interfered. (ECF No. 163, at p. 22.) Encompass points to the circumstances surrounding Maser's changed bid on the Line 328 project as evidence that Hilsman and Maser accessed and used information on the Egnyte server. (*Id.*) The Court concludes that Encompass has created an issue of fact with regard to whether Encompass would have been awarded the Line 328 project had it not been for Hilsman's interference.

58. As to Hilsman's first argument, the undisputed evidence establishes that Hilsman, while working at Maser, was a competitor with Encompass for the type of work involved in the Line 328 project and had a legitimate business interest in acquiring such work of that nature. Nevertheless, the evidence that Hilsman accessed Encompass' confidential Egnyte data and Encompass' bid for the Line 328 project, and that Maser then changed its bid to undercut Encompass' bid, is also sufficient to create an issue of material fact as to whether Hilsman acted with legal malice. Viewing the evidence in the light most favorable to Encompass, these facts could support a jury concluding that Hilsman intentionally and wrongfully used Encompass' confidential information to prevent Encompass from winning the Line 328 project contract, and that Hilsman took these actions with the design of gaining an unfair advantage over Encompass. *See Murphy*, 69 N.C. App. at 328-29.

59. Therefore, to the extent Hilsman's Motion seeks summary judgment in his favor as to Encompass' claim for tortious interference with prospective economic advantage, Hilsman's Motion should be DENIED.

C. **Computer Trespass**

60. Defendants seek summary judgment in their respective favors on Encompass' claim for computer trespass. In the Verified Complaint, Encompass alleges that "Hilsman and Maser (through Hilsman) used Encompass' computer or computer network without authority and with the intent to . . . [make] an unauthorized copy of Encompass' computer data residing in, communicated by, or produced by Encompass' computer or computer network" and that "Defendants had

no right or permission from Encompass to use its computer or computer network, and/or used Encompass' computer or computer network in a manner exceeding any right or permission." (ECF No. 3, at ¶¶ 57–58.) Encompass alleges that Hilsman's and Maser's conduct violated N.C.G.S. § 14-458.[13] (*Id.* at ¶ 59.)

61. The provisions of section 14-458 relevant to Encompass' claim state that "it shall be unlawful for any person to use a computer or computer network without authority and with the intent to . . . [m]ake or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs, or computer software residing in, communicated by, or produced by a computer or computer network." N.C.G.S. § 14-458(a)(5). The statute further provides that "a person is 'without authority' when [ ] the person has no right or permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission[.]" N.C.G.S. § 14-458(a).

62. Article 60 defines "computer" as "an internally programmed, automatic device that performs data processing or telephone switching." N.C.G.S. § 14-453(2). A "computer network" is defined as "the interconnection of communication systems with a computer through remote terminals, or a complex consisting of two or more interconnected computers or telephone switching equipment." N.C.G.S. § 14-453(3).

63. Defendants argue that they are entitled to summary judgment in their favor on Encompass' computer trespass claim under N.C.G.S. § 14-458[14] because that

---

[13] Section 14-458 is contained within Article 60 of Chapter 14 entitled "Computer Related Crimes." N.C.G.S. §§ 14-453–458.2 ("Article 60").

[14] While section 14-458 governs the crime of computer trespass, the statute allows for "[a]ny person whose property or person is injured by reason of a violation of this section [to] sue for

statute does not apply to the facts of this case, and because Hilsman accessed Encompass' computer network with authorization. (ECF No. 126 [SEALED], redacted at ECF No. 137, at p. 22; ECF No. 125, at pp. 21–22.) Specifically, Defendants argue that (1) the definition of "without authority" under the statute applies to unauthorized use of a *computer* and not a *computer network* as is alleged in this case; and (2) because Hilsman's username and password to the Encompass server remained active through January 4, 2019, and because Hilsman was never instructed to not access the Encompass server, Hilsman's access of the server was *authorized*, citing in support a federal case addressing the "without authorization" issue "under a companion federal law known as the Computer Fraud and Abuse Act ('CFAA')." (ECF No. 126 [SEALED], redacted at ECF No. 137, at pp. 22–26; ECF No. 125, at pp. 21–23; citing *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 202 (4th Cir. 2012) (affirming the dismissal of a CFAA claim brought by employer against a former employee and business competitor where the defendant-employee accessed and downloaded documents before he resigned, and after resigning, used them to gain business for his new employer).

64.    In response, Encompass first argues that Defendants' interpretation of N.C.G.S. § 14-458 is "fatally flawed" because it would render "null" section 14-458(a)(5), which expressly makes unlawful the unauthorized "use of a computer or *computer network*" to make a copy of electronic data. (ECF No. 163, at p. 18 (emphasis added); citing to *HCA Crossroads Residential Centers, Inc. v. N. Carolina Dep't of*

---

and recover any damages sustained and the costs of the suit pursuant to G.S. 1-539.2A." N.C.G.S. § 14-458(c).

*Human Res., Div. of Facility Servs., Certificate of Need Section*, 327 N.C. 573, 578 (1990) ("[A] statute must be construed, if possible, to give meaning and effect to all of its provisions.")).

65.     Second, Encompass argues that, when Hilsman copied data from the Egnyte computer server via the cloud, Hilsman was accessing the data on Encompass' *computers*, citing to the definition of "computer" in the CFAA and authority from the federal courts.  (ECF No. 163, at p. 19; citing 18 U.S.C.A. § 1030(e)(1) (defining the term "computer" to "include[] any data storage facility or communications facility directly related to or operating in conjunction with such device . . ."); *United States v. Savader*, 944 F. Supp. 2d 209, 214 n.5 (E.D.N.Y. 2013) (explaining that "[c]loud storage is a service model in which data is maintained, managed and backed up on remote servers (computers) and then made available to users over a network (typically the internet)" (citation omitted)); *Prop. Rights Law Group P.C. v. Lynch*, No. 13-00273 SOM/RLP 2014 U.S. Dist. LEXIS 74259 (D. Haw. May 30, 2014) (holding that a defendant "[a]ccessing [a plaintiff's] 'cloud' constitutes accessing a 'protected computer' within the meaning of the CFAA").)

66.     Third, Encompass argues that, unlike the CFAA, North Carolina's statute does not use the term "access"; rather, North Carolina makes it unlawful for any person to *use* a computer or computer network without authority.  (ECF No. 163, at p. 20; citing N.C.G.S. § 14-458(a).)  Accordingly, Encompass argues that "the record evidence shows that before and after his resignation from Encompass, Hilsman

copied over 10,000 files related to pricing, profit, performance, *etc.*, so that he would be able to use them for the benefit of his new employer." (*Id.* at p. 21.)

67.     Determination of Defendants' statutory argument requires the Court to interpret the relevant provisions of Article 60 and, more particularly, section 14-458. The Supreme Court of North Carolina summarized the basic principles used by our courts when interpreting the language in a statute as follows:

> [q]uestions of statutory interpretation are ultimately questions of law for the courts . . . . The principal goal of statutory construction is to accomplish the legislative intent. The best indicia of that intent are the language of the statute, the spirit of the act and what the act seeks to accomplish. The process of construing a statutory provision must begin with an examination of the relevant statutory language. It is well settled that where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning.

*Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547 (2018) (cleaned up). In addition,

> [c]ourts should "give effect to the words actually used in a statute" and should neither "delete words used" nor "insert words not used" in the relevant statutory language during the statutory construction process. "[U]ndefined words are accorded their plain meaning so long as it is reasonable to do so." In determining the plain meaning of undefined terms, "this Court has used 'standard nonlegal dictionaries' as a guide." Finally, statutes should be construed so that the resulting construction "harmonizes with the underlying reason and purpose of the statute."

*Midrex Techs. v. N.C. Dep't of Revenue*, 369 N.C. 250, 258 (2016) (citations omitted).

68.     As to Defendants' first argument, while the applicable definition of "without authority" in N.C.G.S. § 14-458(a) appears to create an inconsistency within

the statute by limiting the term to unpermitted access of a "computer" and not a "computer network," here, all parties acknowledge that the Egnyte system (the computer network) provides access to Encompass' *server*. (*See* ECF No. 125, at p. 21 ("Here, Hilsman admits that on specific occasions following his employment he accessed Encompass' cloud-based computer network in the form of the Egnyte server."); ECF No. 164, at p. 1 (referring to the "undisputed fact[]" that "Hilsman [ ] continue[d] to access [Encompass'] Egnyte server for nearly five months following his departure from Encompass").) Encompass alleges in its complaint that access to documents on this server is the basis of its computer trespass claim. (*See* ECF No. 3, at ¶¶ 22–29, 56–59.) While "server" is not defined in the trespass act, the Court may look to standard non-legal dictionaries as a guide. *See Midrex Techs.,* 396 N.C. at 258. Merriam-Webster defines "server" as "a computer in a network that is used to provide services (such as access to files or shared peripherals or the routing of email) to other computers in the network." *Server*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/server (last visited May 20, 2021). Dictionary.com defines "server" as "a computer that makes services, as access to data files, programs, and peripheral devices, available to workstations on a network." *Server*, Dictionary.com, https://www.dictionary.com/browse/server (last visited May 20, 2021).

69.     In addition, it is a tenet of North Carolina statutory construction that "[p]ortions of the same statute dealing with the same subject matter are to be considered and interpreted as a whole, and . . . every part of the law shall be given

effect if this can be done by any fair and reasonable intendment." *Huntington Props., LLC v. Currituck Cty.*, 153 N.C. App. 218, 224 (2002) (quotation and citation omitted). Here, the first sentence of section 14-458(a) makes it unlawful to use "a computer *or* computer network without authority." The last sentence in this subsection defines "without authority" as used in the subsection (a). The most logical reading of the language is that "without authority" is intended to apply to both use of a computer or use of a computer network. It would be highly inconsistent to make it unlawful for a person to use a computer without authority but permit them to access the information through the computer's *network* without authority. In fact, the conduct prohibited by subparagraphs (a)(1)–(6) (*i.e.*, disabling a program on a computer network, altering or erasing data or programs, or making copies of computer data) would mostly be impossible without accessing the network to which a computer is linked.

70. Further, this Court's interpretation is in line with the various federal cases interpreting the CFAA cited by Encompass holding that a "computer" includes cloud storage and servers. (*See* ECF No. 163, at pp. 19–20 and the cases cited therein.)

71. Therefore, the Court concludes that the term "without authority" in N.C.G.S. § 14-458(a) includes the use of computers and computer networks.

72. As to Defendants' second argument, while the Court acknowledges the fact that Encompass failed to revoke Hilsman's access to Encompass' server after Hilsman's resignation, the Court is not persuaded that Hilsman simply didn't know, or was never "instructed," that accessing this information on the Encompass server

after his departure from Encompass was prohibited. First, the confidentiality provision in Hilsman's Employment Agreement plainly states that Hilsman

> shall not, at any time during the term of this Agreement or for one year thereafter, disclose to or make use of for any person, corporation or other entity, any proprietary files, trade secrets or other confidential information defined as, the business, clients, methods, operations, financing or services of [Encompass].

(ECF No. 110.11, at ¶ 8.) Second, Encompass' Standards of Conduct implemented in 2016 stated, in pertinent part with regards to "Confidentiality/Intellectual Property":

> [y]our employment with [Encompass] assumes an obligation to maintain confidentiality even after you leave our employment. Employee agrees that all information . . . shall be held in confidence by Employee and shall not be used by Employee for any purpose other than for the performance of the services contemplated by this Agreement or any other agreement between the parties.

(ECF No. 146.1, at p. 2.) Third, Encompass took measures to secure the information on the Egnyte server, such as password protection and folder permissions limiting the access of certain information to only certain individuals. (ECF No. 146.4, at pp. 71–72; ECF No. 146.3, at p. 97; ECF No. 146.14, at ¶ 9.)

73. At the very least, there remains a dispute of material fact as to whether Hilsman was authorized to access this information on the Egnyte server after his employment with Encompass terminated. Further, the federal case upon which Defendants rely in support of their argument—*WEC Carolina Energy Solutions LLC*—involved an employee's access of a server *during* his employment and before his resignation. *See* 687 F.3d at 202. Here, the evidence demonstrates that Hilsman accessed the Egnyte server *after* he was no longer employed by Encompass. (ECF No.

152.5.) To the extent these various accesses to the Egnyte server can be explained by way of the Egnyte Desktop Sync function (*see, e.g.*, ECF No. 125, at p. 7), Defendants have neither argued nor provided sufficient evidence that this automatic download function accounts for every single access by Hilsman of the Egnyte server after he was no longer employed by Encompass.

74. Therefore, the Court concludes that Defendants have failed to establish that they are entitled to judgment as a matter of law on Encompass' claim for violation of section 14-458. Accordingly, to the extent Maser's Motion and Hilsman's Motion seek summary judgment in their respective favors on Encompass' claim for violation of N.C.G.S. § 14-458, the Motions should be DENIED.

**D.    UDTPA**

75. Defendants argue that Encompass' UDTPA claim fails as a matter of law because it is based on the same conduct as Encompass' misappropriation claim under the NCTSPA. (ECF No. 125, at p. 19; ECF No. 126 [SEALED], redacted at ECF No. 137, at p. 27.) Hilsman also contends that this lawsuit is an employment dispute, and employment disputes do not give rise to claims under the UDTPA. (ECF No. 164, at p. 5–6.)

76. "A violation of the [NC]TSPA may also constitute an unfair trade practice." *Safety Test & Eqip. Co.*, 2015 NCBC LEXIS 40, at *47 (citing *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 659–60 (2009); *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172–73 (1992)). Given this Court has concluded that Encompass' misappropriation claim under the NCTSPA should

survive summary judgment, Defendants' Motions for Summary Judgment seeking summary judgment in their favor on Encompass' UDTPA claim should, accordingly, be DENIED.

### E.    Punitive Damages

77.    As a "Sixth Cause of Action," Encompass asserts a claim for punitive damages under N.C.G.S. § 1D-1, et seq.  (ECF No. 3, at ¶¶ 64–68.)  Maser and Hilsman make short, passing reference to their seeking of summary judgment on the punitive damages claim, but neither make any substantial or persuasive argument in support.  Therefore, to the extent Maser's Motion and Hilsman's Motion seek summary judgment in their respective favors on Encompass' claim for punitive damages, Defendants' Motions for Summary Judgment should be DENIED.

### F.    Line 466 Project and Line 467 Project

78.    Hilsman additionally contends that the Court should grant summary judgment in its favor on Encompass' claims for damages regarding the Line 466 Project and Line 467 Project because "counsel for Encompass emailed Defendants stating that it would 'remove two of those projects from our lost profits grid'" and that "the two projects specified were Line 466 and Line 467."  (ECF No. 126 [SEALED], redacted at ECF No. 137, at p. 27; citing ECF No. 110.14.)  Accordingly, Hilsman argues that "Encompass' lost profits and damages claims should be limited to the Line 328 and Line 457 projects[.]" (*Id.*)  Encompass made no argument in opposition to this contention.  Accordingly, Hilsman's Motion seeking summary judgment in his

favor on Encompass' claims for damages regarding the Line 466 Project and the Line 467 Project should be GRANTED.

VI.     CONCLUSION

THEREFORE, it is ORDERED that the Motions are GRANTED, in part, and DENIED, in part, as follows:

1. Hilsman's Motion to Strike is **DENIED**.

2. Defendants' Motions for Summary Judgment seeking summary judgment in their favor on Encompass' misappropriation claim under the NCTSPA are **DENIED**.

3. Defendants' Motions for Summary Judgment seeking summary judgment in their favor on Encompass' tortious interference with prospective economic advantage claim are **DENIED**.

4. Defendants' Motions for Summary Judgment seeking summary judgment in their favor on Encompass' computer trespass claim are **DENIED**.

5. Defendants' Motions for Summary Judgment seeking summary judgment in their favor on Encompass' UDTPA claim are **DENIED**.

6. Defendants' Motions for Summary Judgment seeking summary judgment in their favor on Encompass' punitive damages claim are **DENIED**.

7. Hilsman's Motion seeking summary judgment in his favor on Encompass' claims for damages regarding the Line 466 Project and the Line 467 Project is **GRANTED**.

SO ORDERED, this the 28th day of June, 2021.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases